

# In the Missouri Court of Appeals
## Eastern District

### DIVISION TWO

| | |
|---|---|
| FANNIE MAE, | ) |
| | ) No. ED101796 |
| Appellant/Cross-Respondent, | ) |
| | ) |
| vs. | ) Appeal from the Circuit Court of |
| | ) the City of St. Louis |
| UNIVERSITY VILLAGE APARTMENTS, | ) |
| UVA PARTNERS L.L.C., RICK YACKEY, | ) |
| MIDLAND MANAGEMENT, L.L.C., | ) Honorable Thomas C. Grady |
| WOODSMILL MANAGEMENT COMPANY, | ) |
| and BILL L. BRUCE, | ) |
| | ) |
| Respondents/Cross-Appellants. | ) Filed:  October 27, 2015 |

### Introduction

Fannie Mae appeals the judgment of the Circuit Court of St. Louis City awarding it $161,816.08 for the breach of the obligation to pay net rents and $194,146.96 in attorney and expert fees.  In four points on appeal, Fannie Mae claims that the trial court erred by reducing Fannie Mae's net rents damages because (1) reduction of damages is an affirmative defense that was not pleaded or tried by consent; (2) the loan documents allowed a credit only for "current operating expenses;" (3) the amounts credited were unrelated to the borrower's failure to pay net rents and, thus, do not reduce liability; and (4) even if the reduction was warranted, $142,060.66 of that amount was improperly credited twice.  University Village Apartments, L.P., UVA Partners, L.L.C., Bill L. Bruce, Rick Yackey, Midland Management L.L.C., and Woodsmill

Management Company (Defendants) cross-appeal. In two points, Defendants claim that the trial court erred by (1) awarding Fannie Mae any net rents damages because payments made from rents collected post default were made for "reasonable operating expenses;" and (2) assessing attorney and expert fees against Bruce and Yackey. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

**Factual Background**

In 2005, real estate developers, Bruce and Yackey, undertook the redevelopment of a St. Louis warehouse near St. Louis University into a modern 242-unit apartment complex, including commercial space on the ground level. Multiple entities were formed for the execution of the project, including University Village Apartments, L.P. (Borrower), which would be the owner of the project; UVA Partners, L.L.C. (Partner), which was Borrower's general partner; and University Village Tenant, L.L.C. (Tenant), which was the master tenant that entered into a Master Lease for the property. Woodsmill Management Company (Woodsmill), wholly owned and controlled by Bruce, entered into a management agreement to manage the property. Midland Management, L.L.C. (Midland), owned and controlled by Bruce, actually performed the daily management of the property. Landmark Capital (Landmark), also owned by Bruce, subleased the property's commercial space from Tenant.

Initially, the project was financed through several loans. Additional financing was available through the sale of historical tax credits, for which the building was eligible. Because this financing would not be realized until the sale of the credit, a smaller "bridge" loan was obtained from Great Southern Bank (GSB) for use until the tax credits were sold.[1] Several years later, near the project's completion, Borrower sought a permanent loan to replace these loans.

---

[1] The GSB loan included an additional amount secured by a tax increment financing arrangement with the City of St. Louis.

*Loan Documents*

Consequently, in March 2008, Borrower executed a Multifamily Note (Note) in the amount of $31,000,000. The Note was secured by a security instrument, the Multifamily Deed of Trust, Assignment of Rents and Security Agreement (Deed of Trust), which encumbered the property. The Note and Deed of Trust were assigned to Fannie Mae.

As relevant to this dispute, Paragraph 9(a) of the Note provides that Borrower "shall have no personal liability" under the Note or Deed of Trust for repayment of the indebtedness.[2] Paragraph 9(b), however, includes several exceptions to non-recourse liability, or bar against personal liability, including liability for a "portion of the Indebtedness equal to any loss or damage suffered by [Fannie Mae] as a result of:

> (1) failure of Borrower to pay [Fannie Mae] upon demand after an Event of Default, all Rents to which [Fannie Mae] is entitled under Section 3(a) of the [Deed of Trust] and the amount of all security deposits collected by Borrower from tenants then in residence; [or]
>
> \*　　\*　　\*
>
> (5) failure to apply Rents, first, to the payment of reasonable operating expenses . . . and then to Debt Service Amounts, except that Borrower will not be personally liable (i) to the extent that Borrower lacks the legal right to direct the disbursement of such sums because of a bankruptcy, receivership or similar judicial proceedings, or (ii) with respect to Rents that are distributed in any calendar year if Borrower has paid all operating expenses and Debt Service Amounts for that calendar year.

Section 3(a) of the Deed of Trust, referenced by Paragraph 9(b)(1), provides that Borrower "absolutely and unconditionally assigns and transfers to [Fannie Mae] all Rents."[3]

---

[2] Such a financing vehicle is known as a "non-recourse loan," which is a secured loan "that allows the lender to attach only the collateral, not the borrower's personal assets, if the loan is not repaid." BLACK'S LAW DICTIONARY (7th ed. 1999). Typically, the consideration for such an agreement is the borrower's promise not to encumber the property with other liens or security interests.

[3] Section 1(x) of the Deed of Trust defines "rents" as:

3

The Note was also accompanied by an Acknowledgement and Agreement of Key Principal to Personal Liability for Exceptions to Non-Recourse Liability (Acknowledgment). This document was signed by Bruce and Yackey, who agreed to "absolutely, unconditionally, and irrevocably . . . pay to [Fannie Mae], or its assigns, on demand, all amounts for which Borrower is personally liable under Paragraph 9 of the [Note]."

### *Default & Foreclosure*

On May 1, 2010, Borrower failed to fulfill its monthly payment obligation on the debt.[4] Thereafter, Borrower remained in default, remitting only partial payments in May and July 2010. In January 2011, Fannie Mae filed a petition against Borrower, Partner, Bruce, Yackey, Midland, and Woodsmill, among others. Fannie Mae contemporaneously filed a motion to appoint a receiver. The trial court appointed the receiver on January 24, 2011.

On November 22, 2011, consistent with the power of sale provision in the Deed of Trust, Fannie Mae foreclosed on the property and a trustee's sale was held. The successor trustee accepted Fannie Mae's credit bid of $26,000,000 and ownership of the property was transferred to Fannie Mae. At the time, the total payoff amount on the loan was $44,155,374.89. At the time of the foreclosure, PNC Bank held the post-default payments Borrower had made, which included $142,060.66 in partial debt service payments from May and July 2010 and $66,141.26 in "replacement reserves," an account that Borrower had paid into every month to cover the

---

all rents (whether from residential or non-residential space) revenues and other income of the Land or the Improvements, including subsidy payments received from any sources . . . , parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and deposits forfeited by tenants.

[4] Occupancy in the building decreased shortly after the project's completion because of competition from other residential complexes and because St. Louis University decided to require many of its students to live in school-owned campus housing.

4

project's capital needs. This total amount, $208,201.92, referred to as "impound balances," were "swept" to Fannie Mae at foreclosure.

As the new owner of the property, Fannie Mae sought to terminate the Master Lease. Chevron TCI, Inc. (Chevron), however, had purchased the property's historical tax credits for $8.4 million and its receipt of the tax benefit for the purchase of those credits was contingent on continuation of the Master Lease through December 15, 2011. Fannie Mae, therefore, agreed not to terminate the Master Lease before that date in exchange for $500,000 (Chevron payment).

### *Trial Court Proceedings*

Approximately six months after the foreclosure, in May 2012, Fannie Mae filed an amended petition. In relevant part, the petition alleged in Count I that Borrower breached the terms of the Note and is liable to Fannie Mae for both the deficiency on the Note and net rents; in Count IV that Partner is liable to the extent of Borrower's liability; and in Counts II and III that Bruce and Yackey are liable to the extent of Borrower's liability under the Acknowledgment as guarantors. With respect to the deficiency claim, Fannie Mae alleged that the GSB loan, which had been extended after execution of the loan documents, constituted a "transfer" that had triggered recourse liability under the Note, i.e., personal liability for the Note's deficiency. Fannie Mae's net rents claim was based on the failure to remit net rents due after the event of default, in violation of Paragraphs 9(b)(1) and (5) of the Note. The petition also alleged, in Counts VI, VII, and VIII that Woodsmill and Midland breached the Woodsmill Management Agreement, the Assignment of Management Agreement, and their fiduciary duty to Fannie Mae.

After a bench trial, the trial court issued a "partial judgment" rejecting Fannie Mae's claim that Borrower, Partner, Bruce, and Yackey were liable for the deficiency due on the Note, reasoning that none of the events triggered personal liability for the entire deficiency of the loan.

5

Next, considering Fannie Mae's net rents claim, the trial court found Borrower liable for net rents during the default period under Paragraph 9(b)(1) and (5) of the Note, Partner liable to the extent of Borrower's liability, and Bruce and Yackey liable for net rents as guarantors under the Acknowledgement. The trial court also found that Woodsmill and Midland breached the management agreements and their fiduciary duty to Fannie Mae.

With respect to measuring damages, i.e., the net rents due, the trial court concluded as follows:

40. Fannie Mae presented evidence sufficient to establish damages in the amount of $870,024.00 in Net Rents not paid to Fannie Mae. That figure is derived from the following amounts that should have been placed in trust and paid to Fannie Mae but were not:

● $350,904 in rent, though recorded as revenue on the general ledger, was not collected from Landmark Capital . . . ;

● $20,800 in parking income, also recorded as revenue on the general ledger, that was not collected from the Harrison Building;

● $320,552 was transferred to Midland Management without invoices or supporting documents (there is no verification of what these amounts were paid);

● $45,000 was paid to [Borrower's] attorneys . . . in its bankruptcy filing, and to [Borrower's] attorneys . . . in defense of this lawsuit;

● $27,295 was paid to an accounting firm . . . for a debt predating the default; and

● $105,474 was paid to other, older debts (pre-default accounts payable).

41. Fannie Mae also presented evidence establishing credits against its damages in the amount of $708,201.92. That figure represents $500,000 received from Chevron in exchange for Fannie Mae's agreement to delay terminating the Master Lease, and $208,201.92 in impound balances retained by Fannie Mae.

42. Subtracting credits from gross damages leaves net damages of $161,816.08.

Ultimately, the partial judgment held all Defendants—Borrower, Partner, Bruce, Yackey, Woodsmill, and Midland—liable for this amount. The trial court entered a subsequent judgment on February 10, 2014, incorporating the partial judgment and awarding Fannie Mae $120,961 in attorney fees and $73,185.96 in expert fees against Borrower, Partner, Bruce, and Yackey.[5] Fannie Mae appeals and Defendants cross-appeal.

**Standard of Review**

On appeal from a judgment in a bench-tried case, the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Pearson v. Koster*, 367 S.W.3d 36, 43 (Mo. banc 2012). Claims that no substantial evidence supports the judgment or that the judgment is against the weight of the evidence involve review of the trial court's factual determinations. *Id*. An appellate court "will overturn a trial court's judgment under these fact-based standards of review only when the court has a firm belief that the judgment is wrong." *Sauvain v. Acceptance Indem. Ins. Co.*, 437 S.W.3d 296, 302 (Mo. App. W.D. 2014) (citation and quotations omitted). We defer "to the trial court on factual issues because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." *Hilty Ltd. Family Partnership, L.P. v. Scott*, 379 S.W.3d 883, 886 (Mo. App. W.D. 2012). To the extent the parties raise claims that the trial court erroneously declared or applied the law, our review is de novo. *O'Riley v. U.S. Bank, NA*, 412 S.W.3d 400, 405 (Mo. App. W.D. 2013).

---

[5] Bruce died before the trial court entered its judgment on February 10, 2014. Consequently, the trial court entered a "revised and final judgment," supplanting "Michael J. Parnas, as personal representative for the Estate of Bill Bruce" for Bruce in the February 10, 2014 judgment.

**Discussion**

Fannie Mae's four points on appeal challenge the trial court's decision to offset Fannie Mae's $870,024 in net rents damages (Points I-IV). Defendants' cross-appeal challenges the trial court's determination that Fannie Mae's net rents damages totaled $870,024 (Point V), as well as the trial court's decision to award attorney and expert fees against Bruce and Yackey (Point VI). Because Fannie Mae's appeal presumes that $870,024 in net rents damages is correct and Defendants' cross-appeal challenges that calculation, we consider Defendants' Point V first, followed by Fannie Mae's points on appeal. We consider the award of attorney and expert fees, Point VI, last.

### Point V: "Net Rents" Damages Calculation

In their first point on cross-appeal (Point V), Defendants claim that the trial court erred by awarding Fannie Mae $161,816.08 in "net rent" damages. According to Defendants, the Note provided for Borrower's payment of "reasonable operating expenses" from rents, as opposed to current operating expenses, as the trial court interpreted the Note. Defendants further claim that Fannie Mae failed to produce evidence that "the entirety of the payments made from rents collected post-default were for items other than 'reasonable operating expenses.'"[6] In response, Fannie Mae argues that substantial evidence supports the trial court's conclusion that Fannie Mae's net rents damages totaled $870,024.

### Measure of Damages

We consider, as an initial matter, Defendants claim that the trial court erroneously interpreted the loan documents, allowing for deduction from rents of "current operating expenses," a phrase used in the Deed of Trust, as opposed to "reasonable operating expenses,"

---

[6] Defendants' point is multifarious in violation of Rule 84.04(d), in that it raises two claims of error: that the trial court erroneously interpreted the loan documents and that the evidence did not support the trial court's conclusion. We exercise our discretion to review this point despite the Rule 84 deficiency.

8

the phrase used in the Note. Specifically, in calculating Fannie Mae's net rents damages, the trial court determined that the Note required the deduction from rents of "current operating expenses:"

> 38. [Borrower] could legitimately use rent income to pay the Property's operating expenses—no one disputed [Borrower's] authority to pay the light bill. However, Fannie Mae correctly argues, citing Section 3(b) of the [Deed of Trust], that [Borrower] could only pay current expenses, i.e., expense incurred from the date Fannie Mae made its demand for rents. That section provides the borrower a revocable license to collect rents and hold them in trust for the lender, to apply the rents to debt service payments under the Note, and to pay the "current costs and expenses of managing, operating and maintaining the Mortgaged Property." The rationale for this clause is to prevent the borrower from using rent revenue that would ordinarily go to Fannie Mae to instead be used by the borrower to pay past expenses that the borrower should have already paid, but did not; it being improper to divert current income from Fannie Mae to pay the borrower's previously incurred debt/expenses.

According to Defendants, the terms of the Note control, pursuant to Section 6 of the Deed of Trust. That provision is an "exculpation" clause, which provides, "Borrower's personal liability for payment of the Indebtedness and for performance of the other obligations to be performed by it under this Instrument is limited in the manner, and to the extent, provided in the Note." Looking to the Note, Paragraphs 9(b)(1) and (5), entitle Fannie Mae, upon the event of default, to all "rents"—meaning all rents, revenue, and income of the property—that Fannie Mae is entitled to under Section 3(a) of the Deed of Trust minus payment of "*reasonable operating expenses*." The implication of Defendants' argument is that all operating expenses, not just those current expenses incurred during the default period, should be deducted from rents.

Contract interpretation is a question law reviewed de novo. *See O'Riley*, 412 S.W.3d at 405. "[T]he primary rule of contract interpretation is that courts seek to determine the parties' intent and give effect to it." *Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 226 (Mo. banc 2013). "The intent of the parties to a contract is presumed to be expressed by the ordinary

meaning of the contract's terms." *Triarch Indus. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005). "When the language of a contract is clear and unambiguous, the intent of the parties will be gathered from the contract alone, and a court will not resort to a construction where the intent of the parties is expressed in clear and unambiguous language." *Chochorowski*, 404 S.W.3d at 226-27.

Defendants are correct that their liability is determined by the terms of the Note. Section 6 of the Deed of Trust limits Borrower's liability for any obligations to that provided in the Note, but does not make the Deed of Trust irrelevant. Section 3(b) of the Deed of Trust, which the trial court relied on, grants Borrower, until an event of default, a revocable license to collect all rents and to apply them against debt service payments as well as the "current costs and expenses of managing, operating and maintaining the Mortgaged Property . . . ." Section 15(b) of the Deed of Trust obligates Borrower to timely pay such current operating expenses. Paragraphs 9(b)(1) and (5) of the Note, however, create personal liability *after* an event of default as a result of Borrower's failure to apply rents first to the payment of "reasonable operating expenses" and then to debt service amounts. Thus, the Note, read together with the Deed of Trust, indicates that before default, Borrower is obligated to pay current operating expenses from rents received and, after default, Borrower must first apply rents to "reasonable operating expenses," then to debt service amounts.

Neither the Note nor the Deed of Trust define "operating expenses," "reasonable" or "current." "Reasonable" is defined as "fair, proper, moderate," while "operating expenses" are defined as "expense[s] incurred in running a business . . . ." BLACK'S LAW DICTIONARY (7th ed. 1999). Given the course of events envisioned by the Note and Deed of Trust—that before an event of default, Borrower is obligated to pay current operating expenses and post-default

10

"reasonable operating expenses"—it is only "fair" and "proper," upon an event of default, that Borrower be permitted to only deduct from rents default-period operating expenses. Any other interpretation, as the trial court recognized, would effectively eviscerate lender's right to rents under the Note, as it would permit Borrower to pay off older payables—which should have been paid prior to the default—possibly leaving lender with no rents. Payment of such previously unpaid operating expenses cannot be construed as "reasonable." Consequently, the Note, by its plain terms, only allows deduction from rents of operating expenses incurred during the default period. The trial court, although it erroneously interpreted the Note by relying on the term "current operating expenses" under Section 3(b) of the Deed of Trust, effectively reached the same conclusion by precluding the deduction from rents of pre-default operating expenses. Reversal is not required when a trial court reaches the correct result for the wrong reason. *See Fix v. Fix*, 847 S.W.2d 762, 766 (Mo. banc 1993).

### *Evidentiary Support*

Having concluded that the term "reasonable operating expenses" means operating expenses incurred during the default period, we next consider whether Fannie Mae adduced sufficient evidence to support the trial court's finding that the net rents owed totaled $870,024. To establish the net rents owed, Fannie Mae presented the expert testimony of a forensic accountant, Vince Cummings, who testified that the total net rents owed was $870,024. To reach this number, Cummings reviewed Borrower's and Tenant's general ledgers during the post default period of May 10 through January 2011, when Fannie Mae took over. Cummings testified that he added up the total income, i.e., "rents," and then subtracted operating expenses, as recorded in the ledgers, as well as a payment made to the receiver, to arrive at the net rents owed. On the income side, Cummings included $350,904 from Landmark and $20,800 from

11

Harrison Building that was recorded as revenue in the general ledger from the two leases, but had not been collected. Cummings also included as income payments to other entities that should have been turned over to Fannie Mae. These payments included: $320,552 in payments to Midland, which did not have any supporting documentation or invoices to demonstrate that that payment was for an operating expense; a $45,000 payment to a law firm that Cummings did not consider an ordinary expense; a $27,295 payment to an accounting firm that Cummings concluded was an "older payable" predating default; and $105,474 in other older payables predating default to other vendors that should have been paid to Fannie Mae instead.

Given Cummings' testimony, there is no merit to Defendants' claim that Fannie Mae failed to introduce evidence showing that payments made post default were not "reasonable operating expenses." Defendants make much of the "unique nature of this entire transaction" and the fact that Bruce testified that Landmark was never intended to pay any rent under its sublease. Defendants make a similar argument with respect to Harrison Building, pointing out that there was no expectation that Harrison Building would pay rent when another entity was already paying for parking spaces on the property. Defendants, however, fail to recognize that the loan documents define "rents" to include unpaid rents. *See* Deed of Trust, Section 1(x), *supra* n. 3. Moreover, Defendants' argument—that the payments to Midland, the law and accounting firms, and for older payables predating default should have been categorized as reasonable operating expenses—is simply an attempt to re-argue the evidence. The trial court, however, "is free to believe or disbelieve all, part or none of the testimony of any witness," *Pearson*, 367 S.W.3d at 70 (citation and quotations omitted), and this Court will not re-weigh the evidence or supplant the trial court's credibility determinations with its own. Defendants fail to make a cogent argument why, under the applicable standard of review, the trial court's findings

12

regarding net rents are not supported by substantial evidence or are otherwise against the weight of the evidence. Point V denied.

### *Point I: Offset to "Net Rent" Damages*

We next consider Fannie Mae's claim that the trial court erred by reducing its net rents damages by $708,201.92 (collectively, the Chevron payment and impound balances) because reduction of damages is an affirmative defense and Defendants did not plead such an affirmative defense, ask for a reduction of damages at trial or in their Proposed Findings of Fact and Conclusions of Law, and the issue was not tried by consent. Defendants respond that the offset was proper because the issue was tried by consent.

Fannie Mae is correct that Defendants' answer does not plead an affirmative defense of offset, i.e., the answer does not plead that the $500,000 Chevron payment or the $208,201.92 in impound balances should be applied as credits or offsets against the net rents claims. "Credits and offsets are affirmative defenses[,]" which must be pleaded in an answer and, if they are not, they will be deemed waived. *Echols v. City of Riverside*, 332 S.W.3d 207, 210-11 (Mo. App. W.D. 2010). Defendants do not dispute that they did not raise the affirmative defense of offset in their pleadings. Instead, to avoid the application of waiver, Defendants assert that the applicability of the Chevron payment and impound balances as offsets was tried by consent.

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 55.33(b). "[A] party cannot be said to have implicitly consented to trying an issue outside the pleadings unless the 'consented to' evidence would have been irrelevant to the issues that *were* contained within the pleadings." *Hutchens v. Burrell, Inc.*, 342 S.W.3d 399, 404-05 (Mo. App. W.D. 2011) (citing *Edna Enters., Inc. v. Spirco Envtl., Inc.*, 853 S.W.2d 388, 392

13

(Mo. App. E.D. 1993) ("The implied consent rule applies only where the evidence presented bears solely upon the unpleaded issue and not upon issues already in the case.")). "In effect, the implied consent rule provides that if evidence applying to a new issue is admitted, without a timely and specific objection, and the evidence is not relevant to issues already present, Rule 55.33(b) treats the new issue as having been raised in the pleadings." *Kansas City v. New York - Kan. Bldg. Assocs., L.P.*, 96 S.W.3d 846, 854 (Mo. App. W.D. 2002).

First, there is no indication that the issue of an offset was tried by express consent. Although Fannie Mae introduced evidence regarding the Chevron Payment and the impound balances relative to their deficiency claim, neither Fannie Mae nor Defendants ever suggested during trial that these payments should be applied as an offset to the net rents claim. Defendants did not ask for an offset in their affirmative defenses and did not raise the issue at trial. Defendants' Proposed Findings of Fact and Conclusions of Law do not reference the impound balances and only reference the Chevron payment in relation to the Note deficiency claim to explain the origin of the GSB encumbrance on the property and to suggest that Fannie Mae's receipt of the $500,000 was contrary to good faith and fair dealing. Likewise, during closing argument, defense counsel refers to the Chevron payment as an indication that Fannie Mae somehow acted in bad faith contrary to an earlier order in the case. Under these circumstances, it cannot be said that the parties expressly consented to try the issue of offset.

Regarding implied consent, again, the record indicates that Fannie Mae injected the Chevron payment and impound balances into the litigation in relation to their claim that Defendants were liable for the deficiency on the Note. To establish its claim for the Note deficiency, Fannie Mae had to show that recourse liability had been triggered. Under Paragraph 9(c)(2) of the Note, recourse liability would be triggered upon "a Transfer that is an Event of

14

Default under Section 21 of the Security Instrument." That section includes transfers of the mortgaged property or interest in the mortgaged property; "transfers," under the Deed of Trust, include the attachment of another encumbrance or security interest.

At trial, it was Fannie Mae's theory that the GSB loan, which was collateralized with the tax credits purchased by Chevron but was accidentally amended and recorded to provide for an extended maturity date, constituted such an encumbrance. Consequently, Chevron's role in relation to the GSB lien was directly relevant to Fannie Mae's deficiency claim. Likewise, the amount of the Chevron payment was relevant to the calculation of damages for that claim, as testimony established that Fannie Mae applied the $500,000 against the Note deficiency. Similarly, Fannie Mae also introduced evidence that it applied the impound balances, totaling $208,201.92, against the Note deficiency. Therefore, because both the Chevron payment and the impound balances were relevant to the deficiency claim, it cannot be said that the affirmative defense of offset was tried by implied consent. *See Hutchens*, 342 S.W.3d at 404-05.

Defendants, however, assert that the issue of offset was necessarily tried by express consent, given that Fannie Mae introduced evidence related to the Chevron payment and impound balances. This argument fails to appreciate that Fannie Mae raised the Chevron payment and impound balances in relation to its deficiency claim and in no way suggested that the payments should offset the net rents claim. Defendants also suggest that the implied consent rule is inapplicable because it was not Defendants that introduced the new evidence. Defendants, however, cite no authority that the implied consent rule does not apply to defendants and plaintiffs alike.

Defendants alternatively argue, relying on *Pace Properties v. American Mfr. Mut. Ins. Co.*, 918 S.W.2d 883 (Mo. App. E.D. 1996), that consent is not necessary for the amendment of

15

the pleadings and that such an amendment may be predicated on avoiding prejudice. The trial court in *Pace Properties* expressly amended the pleadings to conform to the evidence. *Id.* at 888. On appeal, the *Pace Properties* Court noted, "A trial court may freely allow the pleadings to be amended to conform to the evidence, without the consent of the non-moving party, if . . . the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would cause prejudice in maintaining the action or defense upon the merits." *Id.* (citation and quotations omitted). The Court then held that the defendant insurer did not suffer prejudice by the trial court's amendment of the pleadings because the defendant knew the insured was seeking the particular damages to which the pleadings were conformed. *Id.* *Pace Properties* is distinguishable because here, unlike in *Pace Properties*, the trial court did not amend the pleadings. Consequently, the rule—that the trial court may amend the pleadings absent a party's consent so long as no prejudice runs to the objecting party— simply has no relevance to this case. Further, even assuming the rule had some applicability to the present scenario, it cannot be said the Fannie Mae would not be prejudiced by an amendment to the pleadings because, unlike in *Pace Properties*, there is no indication that Fannie Mae knew Defendants were seeking an offset from the net rents damages.

"The relief awarded in a judgment is limited to that sought by the pleadings." *Norman v. Wright*, 100 S.W.3d 783, 786 (Mo. banc 2003). Because Defendants did not request an offset as an affirmative defense and the issue was not tried by implied or express consent at trial, the trial court misapplied the law in awarding Defendants such relief and reducing Fannie Mae's net rents damages by $708,201.92. Point I granted. Because this point is dispositive of Fannie Mae's appeal, we need not consider the alternative bases for reversing the trial court's application of an offset to the net rents damages raised in Points II through IV.

16

***Point VI: Attorney & Expert Fees***

In their second point on cross-appeal (Point VI), Defendants claim the trial court erred in assessing attorney and expert fees in the amount of $194,146.96 against Bruce and Yackey. According to Defendants, the terms of the Acknowledgment do not make Bruce and Yackey liable for Borrower's obligation to pay Fannie Mae's attorney and expert fees. Fannie Mae responds that the trial court did not err in assessing the fees because the Note provides for liability for "any indebtedness, which includes litigation expenses as defined in Paragraph 11 of the Note."

"Generally, Missouri courts follow the American Rule, which requires each litigant to bear the expense of his or her own attorneys' fees." *Midland Property Partners, L.L.C. v. Watkins*, 416 S.W.3d 805, 817 (Mo. App. W.D. 2013). An exception to this rule exists where attorney's fees are provided for by contract. *Id*. We, therefore, turn again to established principles of contract interpretation, keeping in mind that our primary goal is to "determine the parties' intent and give effect to it." *Chochorowski*, 404 S.W.3d at 226. We further recognize, consistent with the American rule, that Missouri courts "have favored the award of attorneys' fees only where a contract expressly authorizes their recovery." *Watkins*, 416 S.W.3d at 819. The rules governing construction of contracts similarly apply to the Acknowledgment, but we must be cognizant that "the liability of a guarantor is to be strictly construed according to the terms of the guaranty agreement and may not be extended by implication beyond the strict letter of the obligation." *Capitol Group, Inc. v. Collier*, 365 S.W.3d 644, 648 (Mo. App. E.D. 2012) (citation and quotations omitted).

Here, in determining that Bruce and Yackey are liable for attorney and expert fees, the trial court determined that the "indebtedness" for which Borrower (and thus Bruce and Yackey

17

via the Acknowledgment) may be liable under Paragraph 9 includes liability for attorney and expert fees. The trial court stated:

> Before determination of appropriate sums in Plaintiff's pleas for fees, the Court will address Defense argument that fees are not contemplated in the loan documents. The Court concludes Paragraph 11 of the Note controls this issue and provides that Borrower pay attorney fees and costs of [Fannie Mae] incurred in efforts to collect sums due under the Note, as a result of any loan default. In the [Acknowledgment], Defendants Bruce and Yackey agree to be bound to pay all amounts for which they are liable under Paragraph 9 of the . . . Note. The term "Indebtedness" in Paragraph 1 of this Note includes Paragraph 11 of said Note. In turn, Paragraph 11 of the Note is incorporated in Paragraph 9 via the definition of "Indebtedness" on the first page of the Note.

There is no dispute that, under the Acknowledgement, Bruce and Yackey are personally liable to the extent of Borrower's liability under Paragraph 9. The first paragraph of the Acknowledgment provides that Bruce and Yackey "absolutely, unconditionally and irrevocably agree[] to pay to [Fannie Mae] . . . on demand, all amounts for which Borrower is personally liable under Paragraph 9 of the . . . Note . . . ." In turn, Paragraph 9(b) of the Note states that Borrower "shall be personally liable to [Fannie Mae] for the repayment of a portion of the Indebtedness equal to any loss or damage suffered by [Fannie Mae] as a result of" certain events. Paragraph 1 of the Note broadly defines "Indebtedness," in part, as "the principal, interest on, *or any other amounts due at any time under this Note*, the [Deed of Trust] or any other Loan Documents . . . ." (Emphasis added). Paragraph 11 of the Note, pertaining to attorney and expert witness fees, provides, in part:

> Borrower shall pay on demand all expenses and costs, including fees and out-of-pocket expenses of attorneys and expert witnesses and costs of investigation, incurred by [Fannie Mae] as a result of any default under this Note . . . .

Plainly, attorney and expert fees fall within the definition of "indebtedness," as "any other amounts due at any time under [the] Note."

18

A careful reading of the Acknowledgment and the Note's Paragraph 9, however, indicates that Bruce and Yackey are personally liable for all amounts due under Paragraph 9 of the Note, which only includes a *"portion* of the Indebtedness *equal to any loss or damage"* as a result of Borrower's breach. (Emphasis added). Significantly, the term "indebtedness" is qualified by the phrase "portion . . . equal to any loss or damage." This phrase, thus, limits the Note's broad definition of indebtedness to liability only for losses and damages caused by Borrower's breach. Losses and damages are not, by their plain meanings, attorney or expert witness fees and expenses. *See* BLACK'S LAW DICTIONARY (7th ed. 1999) (defining "damages" as compensation for loss or injury ); *see also Lawson Rural Fire Ass'n v. Avery*, 764 S.W.2d 113, 116 (Mo. App. W.D. 1988) ("[A]ttorney's fees are not ordinarily recoverable as *damages . . ."* (emphasis added)). And, this Court will not construe the terms "loss or damage" to encompass litigation costs, contrary to the American rule, where the imposition of such costs is not unequivocally and expressly provided for. *See Watkins*, 416 S.W.3d at 819 (denying award of attorney fees where contract provided for "costs"). It follows that Bruce and Yackey's liability is only for that portion of the indebtedness constituting losses and damages, which does not include expenses for attorney or expert witness fees.

On appeal, Fannie Mae advocates for the trial court's interpretation of the loan documents. The trial court's construction, however, is contrary to the plain language of the Note and Acknowledgment. In effect, the trial court re-wrote Paragraph 9 to provide that Borrower (and hence Bruce and Yackey) "shall be personally liable to Lender for the repayment of ~~a portion of~~ the Indebtedness ~~equal to any loss or damage~~ suffered by Lender as a result of" Borrower's breach. This Court will avoid a construction that renders any language of the contract nugatory. *See Chochorowski*, 404 S.W.3d at 230. Moreover, the trial court's

understanding of the loan documents ignores established principles of contract interpretation, extends the guarantors' liability by implication beyond the "strict letter of the obligation," *Collier*, 365 S.W.3d at 648, authorizes attorney's fees where they are not expressly granted, and, ultimately, is contrary to the parties' intent as expressed by the plain language of the Note and Acknowledgment. Instead, strictly construing the language of the Acknowledgment and recognizing that attorney's fees are not to be awarded unless expressly authorized, it is clear that Bruce and Yackey are not liable for attorney and expert witness fees under Paragraph 11 of the Note.

Accordingly, we reverse the award for attorney and expert fees as to Bruce and Yackey, but affirm them as to Borrower and Partner. *See* § 359.251.2 RSMo 2000 (a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners). Point VI granted.[7]

## Conclusion

The trial court's determination that Fannie Mae's net rent damages totaled $870,024 is affirmed. The trial court's decision to reduce those net damages by $708,201.92 and to assess $194,146.96 in attorney and expert fees against Bruce and Yackey is reversed. This matter is remanded for (1) entry of an order awarding Fannie Mae $870,024 on its net rents claim and (2) a determination of Borrower and Partner's liability for attorney's fees incurred post-judgment. In all other respects, the judgment of the trial court is affirmed.

_____
Philip M. Hess, Presiding Judge

Gary M. Gaertner, Jr., J. and
Angela T. Quigless, J. concur.

---

[7] Consistent with our reasoning under this point, Fannie Mae's motion for attorney's fees for the costs of this appeal and post-judgment proceedings is denied as to Bruce and Yackey, but granted as to Borrower and Partner.